NATIONAL FEDERATION OF
FEDERAL EMPLOYEES,
Plaintiff,

v.

UNITED STATES of America, et
al., Defendants.

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES,
AFL–CIO, et al., Plaintiffs,

v.

Steven GARFINKEL, et al., Defendants.

AMERICAN FOREIGN SERVICE
ASSOCIATION, et al., Plaintiffs,

v.

Steven GARFINKEL, et al., Defendants.

Civ. A. Nos. 87–2284–OG, 87–2412–OG
and 88–0440–OG.

United States District Court,
District of Columbia.

May 27, 1988.

Bruce Heppen, National Federation of Federal Employees, Washington, D.C., for National Federation of Federal Employees.

Stuart Kirsch, American Federation of Government Employees, Atlanta, Ga., and Joseph Kennedy, Government Accountability Project, Washington, D.C., for American Federation of Government Employees, AFL–CIO, et al.

Patti Goldman, Public Citizen Litigation Group, Washington, D.C., for American Foreign Service Assn.

Robert Irvin, Dept. of Justice, Washington, D.C., for U.S., Garfinkel, et al.

## MEMORANDUM

GASCH, Senior District Judge.

On at least two fronts, plaintiffs in these consolidated cases[1] challenge the lawfulness and constitutionality of various nondisclosure agreements drafted by the Executive Branch to protect the secrecy of classified information. These agreements are embodied in forms drafted by the Information Security Oversight Office ("ISOO"), the Director of Central Intelligence ("DCI"), and the Department of Defense ("DOD"). The forms were prepared as part of a longstanding presidential scheme for restricting unauthorized disclosure of national security information. *See Devel-*

---

1. The complicated procedural history of these cases began on August 17, 1987, with the filing of *National Federation of Federal Employees v. United States, (NFFE),* Civil Action No. 87–2284 (D.D.C.), which attacked only one of the nondisclosure agreements—Standard Form 189 ("SF 189")—now at issue. Two weeks later, *American Federation of Government Employees, AFL–CIO v. Garfinkel, (AFGE),* Civil Action No. 87–2412 (D.D.C. Sept. 1, 1987) was filed, duplicating some of the claims in 87–2284 and adding an assault on Standard Form 4193 ("SF 4193"). After these cases were consolidated, Order of Dec. 2, 1987, the Court granted leave to several members of Congress to participate as *amicus curiae.* For reasons that are evident from the following discussion, these Representatives and Senators joined with the bargaining representative of State Department employees to challenge SF 189, SF 4193, and related forms on grounds separate from those in the two existing cases. *American Foreign Service Association v. Garfinkel, (AFSA),* Civil Action No. 88–0440 (D.D.C. filed Feb. 19, 1988). Following a status conference, all three cases were consolidated. Order of Mar. 9, 1988.

opments in the Law—The National Security Interest and Civil Liberties, 85 Harv.L.Rev. 1130, 1193–94 (1972) (President has been protecting national security information since World War I) [hereinafter *National Security and Civil Liberties*]. Revamped most recently in 1982, the scheme includes the execution of nondisclosure agreements to permit civil remedies for the unauthorized disclosure of national security information. *See* Exec. Order No. 12,356, § 5.2(b), 47 Fed.Reg. 14,874 (Apr. 2, 1982) [hereinafter Exec. Order 12,-356]; National Security Decision Directive 84 ¶ 1 (Mar. 11, 1983) [hereinafter NSDD 84] (Exhibit 1 to Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction).

Troubled by the scope and anticipated impact of the nondisclosure agreements drafted under the Presidential scheme, plaintiffs urge the Court to enjoin implementation and enforcement of the agreements and declare them unconstitutional. Specifically attacked by the several complaints are SF 189 and SF 4193,[2] and form DD 1847–1. With important differences, each of these forms restricts the privilege of the signatory to disclose classified or "classifiable" information. Two of the forms also provide for prepublication review of manuscripts containing, purporting to contain, or derived from classified information. *See* SF 4193 ¶ 4 (Exhibit 5 to Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction); DD 1847–1 ¶ 4 (Jan.1983).

Now pending for the Court's consideration are defendants' motion to dismiss and plaintiffs' collective motions for prelimi-

nary injunction and summary judgment.[3] Briefly, defendants' motion vigorously questions plaintiffs' standing and the constitutionality of congressional action that purports to resolve the dispute over the nondisclosure agreements. Plaintiffs' motion for preliminary injunctive relief contends that the congressional action unequivocally prohibits implementation and enforcement of SF 189, SF 4193, and related forms, entitling plaintiffs to injunctive relief. The complexity of these issues and number of counsel arguing required severance of the underlying constitutional questions regarding specific provisions of the various agreements. Thus, argument on the motions was restricted to the issues of plaintiffs' standing, the constitutionality of the recent congressional action, and the motion for preliminary injunctive relief.

## I. NATIONAL SECURITY INFORMATION, NONDISCLOSURE FORMS, AND CONGRESSIONAL INTERVENTION

Long before nuclear weapons, satellites, and orbiting laser defense systems, the President, pursuant to his Article II powers, undertook to defend national security by limiting access to and disclosure of sensitive information. *See National Security and Civil Liberties*, 85 Harv.L.Rev. at 1199. After World War II, President Truman laid the foundation for the current system of classifying information possessed by the Executive Branch. *See* Exec. Order No. 10290, 3 C.F.R. § 790 (1949–1953 Comp.). Over the past forty years, the information has diversified and the classifi-

---

2. On March 18, 1988, SF 4193 was replaced by SF 4355. The impact of this substitution on the disputes in this case is contested. Defendants contend that the elimination of the term "classifiable" from SF 4355 renders the forms consistent with constitutional and statutory standards. Plaintiffs note, however, that the form continues to impose a prepublication review requirement that allegedly stifles the free speech of SF 4355 signatories.

3. The convoluted procedural history of these cases has technically left pending two other motions. Before *AFSA* made this litigation a tripartite assault on nondisclosure agreements, defendants had moved to dismiss the *NFFE* and

*AFGE* actions. Subsequent events rendered decision of those motions pointless, and they are deemed superseded by the pending omnibus motion to dismiss.

Upon joining the fray, AFSA filed a motion for preliminary injunction which they have now converted to a motion for summary judgment and permanent injunctive relief. *See* Plaintiffs' Motion for Summary Judgment at 2–3. Nevertheless, plaintiffs continued to represent to the Court that preliminary injunctive relief would be welcome pending further examination of the merits. The Court, therefore, has considered the propriety of such a remedy. *See infra* § V.

cation system has become more essential and more complex. *See Department of Navy v. Egan*, — U.S. —, 108 S.Ct. 818, 824, 98 L.Ed.2d 918 (1988).

In this context, NSDD 84, supplementing Exec. Order 12,356, mandates that all people with access to certain national security information execute a nondisclosure agreement. Pursuant to these Presidential directives, the ISOO drafted SF 189 and the DCI adopted an existing document—SF 4193.[4] SF 189 was designated for use throughout the Executive Branch, while SF 4193 was intended for presentation to federal employees with access to sensitive compartmentalized information ("SCI").[5]

### A. *Plaintiffs' Objections to the Nondisclosure Forms*

Primary among plaintiffs' objections to SF 189, SF 4193, and related forms is the use of the term "classifiable" to identify information the disclosure of which is restricted. *See* SF 189 ¶ 1 (Exhibit 2 to Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction); SF 4193 ¶ 1 (Exhibit 5 to Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction). Though undefined in the forms, the term has on several occasions been clarified by the ISOO. In its most recent incarnation, the definition restricts "classifiable information" to "[u]nmarked *classified* information, including oral communications" and *"unclassified* information that meets the standards for classification and is in the process of a classification determination." 52 Fed.Reg. 48,367 (Dec. 21, 1987) (adding 32 C.F.R. § 2003.20(h)(1)) (emphasis in original). The ISOO definition, expressly applicable only to SF 189, also narrows the scope of liability for breach of the agreement to knowing or negligent disclosure of classifiable information. *Id.*

Despite the recently particularized definition of "classifiable," plaintiffs complain that the right of SF 189 and SF 4193 signatories to speak freely and petition Congress is unconstitutionally impaired. Further, they cite section 630 of the Omnibus Continuing Resolution for Fiscal Year 1988, Pub.L. No. 100–202 (Dec. 22, 1987) [hereinafter Continuing Resolution], as proscribing the use of any nondisclosure form containing the term "classifiable." Section 630 provides:

No funds appropriated in this resolution or any other Act for fiscal year 1988 may be used to implement or enforce the agreements in Standard Forms 189 and 4193 of the Government or any other nondisclosure policy, form or agreement if such policy, form or agreement:

(1) concerns information other than that specifically marked as classified; or, unmarked but known by the employee to be classified; or, unclassified but known by the employee to be in the process of a classification determination;

(2) contains the term "classifiable";

(3) directly or indirectly obstructs, by requirement of prior written authorization, limitation of authorized disclosure, or otherwise, the rights of any individual to petition or communicate with Members of Congress in a secure manner as provided by the rules and procedures of the Congress;

(4) interferes with the right of the Congress to obtain executive branch information in a secure manner as provided by the rules and procedures of the Congress;

(5) imposes any obligations or invokes any remedies inconsistent with statutory law.

---

**4.** SF 189 was released for use by Executive Branch agencies on September 9, 1983. The DCI's SF 4193 was prepared in 1981, before the President signed NSDD 84.

**5.** Information regarding intelligence sources and methods, especially the technological mechanisms for intelligence gathering, is a particularly critical subcategory of classified information. SCI is primarily comprised of such infor-

mation. *See* Declaration of William H. Webster ¶ 4 (Exhibit 4 to Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction). The DCI protects this information by authority delegated to it from the President and pursuant to statutory direction. *See* 50 U.S.C. § 403(d)(3) (1982) ("[DCI] shall be responsible for protecting intelligence sources and methods from unauthorized disclosure").

Provided, That nothing in this section shall affect the enforcement of those aspects of such nondisclosure policy, form or agreement that do not fall within subsections (1)–(5) of this section.

Relying on this eleventh hour addition to the Continuing Resolution, plaintiffs insist that declaratory and injunctive relief precluding use of SF 189 and SF 4193 is appropriate and that the underlying constitutionality of the forms need not be addressed.

Equally distressing to plaintiffs is the prepublication review requirement imposed by SF 4193. Paragraph four of that form demands the signer to:

agree to submit for security review by the Department or Agency that last authorized [the signer's] access to [SCI] all information or materials, including works of fiction, which contain or purport to contain any SCI or description of activities that produce or relate to SCI or that [the signer has] reason to believe are derived from SCI, that [the signer] contemplate[s] disclosing to any person not authorized to have access to SCI or that [the signer has] prepared for public disclosure....

Plaintiffs attack this provision as inimical to the First Amendment rights of employees. The alleged constitutional flaw is the breadth of the prepublication review imposed by this paragraph. Plaintiffs contend that the language of the proscription too broadly restricts the disclosure of information and, therefore, chills constitutionally protected speech. Like their objection to the term "classifiable," however, plaintiffs argue that the constitutional questions are deferred by section 630. *See* Continuing Resolution § 630(3).

**6.** For essentially the same reasons, defendants argue that the case is not ripe regarding plaintiffs' attempt to enjoin enforcement of the forms. The complaints are allegedly incomplete because they fail to identify an instance of enforcement, planned enforcement, or revocation of security clearance. Moreover, the implementation issue is allegedly moot as to SF 189 because the ISOO has suspended the use of that form. *See* Letter from Steven Garfinkel, Director, ISOO (Dec. 29, 1987) (Exhibit 8 to Plaintiffs' Motion for Preliminary Injunction).

## B. *Defendants' Motion to Dismiss*

Defendants have responded to all the complaints with an omnibus motion to dismiss. The thrust of the motion is that plaintiffs lack standing and fail to state a claim for which relief may be granted. Given these contentions, the defendants agree with plaintiffs' argument that the constitutionality of the forms is not properly before this Court.

The broad premise of defendants' standing argument is that the plaintiffs have not alleged any injury-in-fact, an essential element of the Article III "Case or Controversy" requirement. A corollary of this contention is that plaintiffs are asserting the legal rights of third parties which is ordinarily barred by prudential principles of standing. Defendants' motion addresses each of the three categories of plaintiffs—individuals, unions, members of Congress—and concludes that none specifies a cognizable injury upon which the jurisdiction of this Court may be founded.[6]

In addition to this jurisdictional challenge, defendants contend that plaintiffs fail to state a claim upon which relief can be granted. Defendants insist that the current posture of SF 189 and SF 4193 precludes any justiciable complaint that the forms are contrary to section 630 of the Continuing Resolution or are unconstitutional. Given the existing definition of "classifiable" and the changes to SF 4193 made upon consideration of section 630,[7] defendants argue that the Executive has complied with section 630. Alternatively, defendants contest the power of Congress to interfere with the President's execution of his responsibility to protect the national security.

**7.** In response to the concerns reflected in section 630, the DCI, through Lieutenant General Edward J. Heinz, Director of the Intelligence Community Staff, supplemented SF 4193 with an addendum to all such forms executed during fiscal year 1988. The addendum provides:

The obligations imposed by this Agreement shall be implemented and enforced in a manner consistent with [section 630], and other applicable law.

## II. PLAINTIFFS' STANDING TO CHALLENGE EXECUTIVE BRANCH POLICY REGARDING ENFORCEMENT AND IMPLEMENTATION OF NONDISCLOSURE AGREEMENTS

In this two-pronged challenge to the Executive's use of nondisclosure agreements, the question of standing must be bifurcated accordingly. The first substantive challenge for the Court's consideration is section 630, the power of Congress to enact such legislation, and the Executive's compliance with the section. As to this issue, the plaintiffs urge that the Executive has failed to abide by the spending restrictions of section 630. This issue only indirectly implicates constitutional rights personal to the plaintiffs or their members. Instead, the directly conflicting forces are two branches of government. The second attack on the agreements is founded on a perceived conflict between plaintiffs' First Amendment rights and the Executive's interest in safeguarding classified information. Inherently, this attack directly implicates the rights of individuals and, therefore, invites a different standing analysis.

Notwithstanding the melting pot pleading that has resulted from consolidation of these cases, certain plaintiffs realistically assert only one or the other of the challenges to the Executive's action. Consequently, the plaintiffs' standing as to each of these prongs must be discussed separately. The standing of each of the three categories of plaintiffs is a subissue in each discussion.

### A. Article III and Prudential Limits on Standing

■ As a consequence of the constitutional requirement that federal courts adjudicate only cases and controversies, U.S. Const., Art. III, plaintiffs have always been required to demonstrate their standing to challenge the actions contested by their lawsuits. *See Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982). Also protected by the "standing" requirement are prudential concerns regarding accessibility to federal forums and the intimacy between a plaintiff's purported interest, the parties' dispute, and the redress sought. *See Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

■ To surmount the constitutional hurdle, a plaintiff must:

at an irreducible minimum ... "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99 [99 S.Ct. 1601, 1608, 60 L.Ed.2d 66] (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 41 [96 S.Ct. 1917, 1924, 1926, 48 L.Ed.2d 450] (1976).

*Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758 (footnote omitted). The battle joined by the parties must be more than abstract debate waiting to alight on a concrete foundation of facts. The plaintiff must show injury-in-fact, *id.* at 473, 102 S.Ct. at 759, but he need not delay his quest for redress until the injury is complete. " 'If the injury is certainly impending that is enough.' " *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2309, 60 L.Ed.2d 895 (quoting *Pennsylvania v. West Virginia,* 262 U.S. 553, 593, 43 S.Ct. 658, 664, 67 L.Ed. 1117 (1923)). This concern is particularly acute when, as in this case, the relationship between Congress and the President is implicated. *Valley Forge,* 454 U.S. at 473–74, 102 S.Ct. at 759.

■ Beyond these limits on judicial power, prudential principles demand that a plaintiff act to vindicate his own rights, not those of a third party. *Warth,* 422 U.S. at 499, 95 S.Ct. at 2205. The impact of these principles on Article III constraints further requires that the controversy be palpable to a distinct and confined population group. The courts will not be embroiled in ventilation of grievances widely shared—grievances better resolved by Congress. *Valley*

*Forge,* 454 U.S. at 474–75, 102 S.Ct. at 759–60.

### B. Standing to Challenge the Executive's Implementation of Section 630

Both the constraints of Article III and the ancillary prudential concerns present formidable obstacles to plaintiffs' attempt to enforce the spending restrictions of section 630. The individual plaintiffs and labor unions apparently fear that disregard for section 630—continued compelled execution of nondisclosure agreements—will stifle disclosure of unclassified governmental information.[8] The right to be vouchsafed by enforcement of section 630 is that possessed by every federal employee to speak freely when compelling governmental interests do not justify circumscription of that freedom.

The injury feared by the congressional plaintiffs is one step further removed. As members of Congress, these plaintiffs assert a right to receive all governmental information under the security of congressional rules for protection of confidential information. If the right of federal employees to disclose information is restricted, the right of Congress to receive it is proportionately limited.

### 1. Congressional Plaintiffs Have No Standing to Challenge the Executive's Implementation of Section 630

▮ To the extent that the congressional plaintiffs assert the rights of federal employees, their standing is suspect. Without question, members of Congress

enjoy no privilege in federal court to defend the rights of third parties.[9] *See Warth,* 422 U.S. at 499, 95 S.Ct. at 2205 (plaintiff must seek vindication of own rights, not those of third parties); *Harrington v. Bush,* 553 F.2d 190, 204 (D.C. Cir.1977) (no special standards for congressional standing). Under narrowly prescribed circumstances, however, congressional plaintiffs are welcome in federal court to reverse a diminution in influence resulting from Executive action. *See Goldwater v. Carter,* 617 F.2d 697, 702 (D.C.Cir.1979).

> To be cognizable for standing purposes, the alleged diminution in congressional influence must amount to a disenfranchisement, a complete nullification or withdrawal of a voting opportunity; and the plaintiff must point to an objective standard in the Constitution, statutes or congressional house rules, by which disenfranchisement can be shown.

*Id.* (citing *Harrington,* 553 F.2d at 212). In contrast, "a diminution in a legislator's effectiveness, subjectively judged by him or her, resulting from Executive action withholding information or failing to obey a statute enacted through the legislator's vote, where the plaintiff-legislator still has power to act through the legislative process to remedy the alleged abuses," *id.,* does not amount to an injury-in-fact sufficient to confer standing.

In this case, the congressional plaintiffs allege only that the Executive agencies have not complied with section 630 and, thereby, have stemmed the flow of infor-

---

**8.** A less specific premise upon which plaintiffs might assert standing is their interest, as citizens, to ensure that Congress' enactments are faithfully executed by the President. As defendants note, such a premise is essentially that once relied upon by taxpayers to challenge spending decisions of the Executive Branch. *See Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *Public Citizen, Inc. v. Simon,* 539 F.2d 211, 217 (D.C.Cir.1976). As in *Public Citizen,* the fair implication of [this premise] is to recognize taxpayer standing to attack any executive action that draws on an outstanding appropriation on the ground that the purchases or services are not in accord with the congressional intent in passing the appropriation. This would place the judiciary in the

role of management overseer of the Executive Branch. Such oversight is a function of Congress.

539 F.2d at 217. Under the narrow doctrine of *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), taxpayer suits are limited to cases alleging specific constitutional proscriptions on taxing and appropriation statutes. *Public Citizen,* 539 F.2d at 218.

**9.** This principle fatally infects any attempt by the Congressional plaintiffs to challenge the nondisclosure forms as contrary to the Constitution. None of these plaintiffs has been required to sign such a form. Thus, they have suffered no injury-in-fact upon which standing could be based.

mation to Congress. Under *Goldwater*, such a claim is clearly inadequate to confer standing. Because the congressional plaintiffs may not employ judicial processes to enforce their view of section 630 or to challenge, on behalf of federal employees, the provisions of SF 189, SF 4193, and related forms, all claims asserted by them are dismissed.

2. **The Labor Union Plaintiffs Have Standing Under the Administrative Procedure Act to Challenge Interpretation and Implementation of Section 630**

■ The labor union plaintiffs attack the implementation of section 630 by the ISOO, DCI, and DOD on the ground that the action taken by these agencies is arbitrary, capricious, and otherwise not in accordance with the law. 5 U.S.C. § 706 (1982). The unions' allegations focus on harm to their members and not on any impairment of the unions' capacity to function as bargaining representatives. Thus, their standing is contingent upon the standing that individual members would have to press the claims now asserted by the unions. *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); *see Warth*, 422 U.S. at 511, 95 S.Ct. at 2211. Additionally, the unions must demonstrate that "the interests [they] seek[ ] to protect are germane to the organization[s'] purpose; and ... neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343, 97 S.Ct. at 2441.

The standing of individual union members turns on the constitutional and prudential considerations already discussed as well as statutory requirements under the Administrative Procedure Act ("APA").[10] 5 U.S.C. § 702 (1982). Section 702 of the APA permits "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant

statute, ... to judicial relief thereof." This statutory gloss on standing principles adds to the showing of injury-in-fact a requirement that plaintiffs be "arguably within the zone of interests to be protected or regulated" by section 630 of the Continuing Resolution. *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970); *see Abourezk v. Reagan*, 785 F.2d 1043, 1050 (D.C.Cir.1986).

The agency actions of which the unions complain are the policies of the DCI, DOD, and ISOO regarding implementation and enforcement of SF 189, SF 4193, and DD 1847–1 during fiscal year 1988. Following enactment of section 630, the ISOO instructed all federal agencies to suspend implementation of SF 189 and to void at the behest of the signatory any SF 189 executed after December 22, 1987. The DCI, however, merely added a paragraph to its SF 4193 which states that the agreement will be enforced in a manner consistent with the requirements of section 630. Federal employees with access to SCI are still required to sign this amended version of the form.[11]

Plaintiffs urge that section 630 requires that all SF 189 forms executed after December 22, 1987 be voided and that all signatories of forms in this group be informed of this action. They also insist that the ISOO be compelled to direct all administrative agencies that execution of SF 189 is not a prerequisite to access to classified information, at least during fiscal year 1988. Regarding SF 4193 and its progeny, the plaintiffs make similar demands for relief, insisting that the addendum to SF 4193 and the successor SF 4355 do not avoid the proscriptions of section 630.

The complaints, which range from twenty-two paragraphs with four counts to eighty-six paragraphs with thirteen counts, successfully, though barely, establish a factual premise for the standing of the plaintiff unions. A generous, but fair reading

---

10. This analysis applies equally well to determine whether individual members of the plaintiff unions would have standing in their own right.

11. On March 22, 1988, SF 4193 was discontinued and replaced by SF 4355 which omits the term "classifiable information" but continues the requirement of prepublication review.

of each of the complaints reveals allegations that members of the plaintiff unions have been required to sign SF 189 or SF 4193 since December 22, 1987. *See Pennell v. City of San Jose,* —— U.S. ——, ——, 108 S.Ct. 849, 855, 99 L.Ed.2d 1 (1988) (district court considering motion to dismiss based on pleadings must construe complaint in light most favorable to plaintiffs). While mere execution of the forms is not injury-in-fact, compulsory execution coupled with the express and implied restrictions on speech constitutes such injury-in-fact.

■■■ Contrary to defendants' argument, the allegation of chilling effect is not *per se* an insufficient basis for standing. More precisely, the question is whether the chill felt by plaintiffs is wholly subjective in which case they have failed to establish an injury-in-fact that the Court is empowered to redress. *See Laird v. Tatum,* 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2325–26, 33 L.Ed.2d 154 (1972) ("[a]llegations of subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm"); *United Presbyterian Church in the U.S.A. v. Reagan,* 738 F.2d 1375, 1378–79 (D.C.Cir.1984) (rejecting standing of group fearing surveillance of its activities under particular Executive Order and anticipating consequent chill of free speech). Objectivity is lent to the anticipated infringement of First Amendment rights when:

> the challenged exercise of governmental power [is] regulatory, proscriptive, or compulsory in nature, and the complainant [is] either presently or prospectively subject to the regulations, proscriptions, or compulsions that he [is] challenging.

*Laird,* 408 U.S. at 11, 92 S.Ct. at 2324–25. The source of the plaintiffs' fear must be more than their "knowledge that a governmental agency [is] engaged in certain activities or ... that, armed with the fruits of those activities, the agency might in the future take some *other* and additional action detrimental to that individual." *Id.* (emphasis in original). Thus, objective, indirect impairment of First Amendment rights may be injury-in-fact.

Although the complaints do not explicitly state that any member of the plaintiff unions has been compelled to sign the nondisclosure forms under threat of discharge or denial of security clearance, the position of the unions as exclusive bargaining agents and the language of the forms make clear that these consequences would flow from refusal to execute or comply with the forms. *See* Affidavit of Perry Shankle ¶ 5 (President of AFSA states that members have told him that they are still being required to execute SF 4193 but seek anonymity for fear of reprisal). Thus, the chilling effect on First Amendment rights of continued compulsory implementation and threatened enforcement of the forms is sufficient injury-in-fact to confer standing.[12] With this conclusion, the injury-in-fact prong of APA standing is satisfied. The requirements of section 702 of the APA are complete because it is obvious that federal employees subject to the Executive's national security information policies comprise the group to be protected by section 630 of the Continuing Resolution.

### 3. The Standing of the Individual Plaintiffs

■■■ Of the three individual plaintiffs,[13] none purports to have been required to

---

12. As noted previously, execution and threatened enforcement of SF 4193 continued, until March 22, 1988, with an addendum purporting to render the form consistent with section 630 of the Continuing Resolution. While execution of SF 189 has been suspended, the ISOO has expressed no intention to waive enforcement of the form during fiscal year 1988. Consequently, it must be assumed that enforcement is still threatened.

13. Jim Stinchcomb, James Douglas, and Louis Brase are plaintiffs in *AFGE,* No. 87–2412–OG. Stinchcomb alleges that he has been instructed

to sign SF 189 but has refused. As a consequence he has allegedly been "threatened with security clearance revocation and resultant loss of employment." Complaint ¶ 4. Douglas has signed SF 189 but alleges that he did so only after he was threatened with revocation of his security clearance and discharge from his position with the Department of Navy. Brase has signed SF 4193 under the same conditions, but has refused to sign SF 189. Douglas and Brase executed their agreements before December 22, 1987.

sign SF 189 since enactment of section 630 of the Continuing Resolution on December 22, 1987. Plaintiff Douglas, however, signed SF 189 before that date and now complains that the ISOO has failed to take appropriate steps to apprise him, and others like him, that the SF 189 cannot be enforced during fiscal year 1988. He contends that the apparent intention of the ISOO to enforce the agreement in contravention of section 630 dissuades him from exercising his constitutional and statutory right to speak freely. *See* Affidavit of Steven Garfinkel ¶¶ 2–4 (Exhibit 7 to Plaintiffs' Motion for Preliminary Injunction). As discussed extensively in the preceding section, an objective chill on First Amendment rights as a consequence of an exercise of governmental power, compulsory in nature, sufficiently states injury-in-fact to confer standing. Thus, plaintiff Douglas has standing to challenge the ISOO's failure to inform signatories to SF 189 that enforcement will not be undertaken during fiscal year 1988.

The same conclusion must be reached regarding plaintiff Brase's execution before December 22, 1987 of SF 4193. The DCI has expressed its intention to continue enforcing previously executed forms. *See* Affidavit of Lieutenant General Edward J. Heinz ¶ 4 (Exhibit 6 to Plaintiffs' Motion for Preliminary Injunction) (only change to SF 4193 in light of section 630 is addendum). Consequently, Brase performs his functions as a Training Manager with the Air Force under the cloud of threatened discharge or loss of security clearance for violation of the agreement.

▮▮▮ Plaintiff Stinchcomb, having refused to sign an SF 189, can suffer no injury under the ISOO's present scheme. Since the form will not be implemented during fiscal year 1988, Stinchcomb cannot be threatened with discharge for refusing to execute the form. Obviously, he cannot be the object of enforcement action because he has not executed an SF 189. Stinchcomb lacks standing to challenge the ex-

isting Executive policy regarding nondisclosure agreements.

4. Summary of Standing to Challenge the Executive's Implementation and Enforcement of Nondisclosure Agreements as Contrary to Section 630

For all purposes, the congressional plaintiffs may be dismissed from the *AFSA* case because they allege no injury-in-fact upon which standing may be based. Limitations on their access to information and diminution of their effectiveness as members of Congress does not constitute injury redressable in the federal courts. Additionally, they have no standing to protect the rights of third parties.

In contrast, the labor union plaintiffs have alleged, with less than meticulous precision, a collection of facts which in the aggregate constitutes injury-in-fact to some of their individual members. Those union members who signed nondisclosure agreements after December 22, 1987, have been compelled by governmental power to take action that allegedly chills their legitimate exercise of constitutional and statutory free speech rights.

Of the three individual plaintiffs, two have standing to challenge the Executive's interpretation of section 630. Plaintiff Douglas has executed a SF 189, and the ISOO apparently intends to take enforcement action against any violation of the agreement. The same is true regarding plaintiff Brase's execution of the DCI's SF 4193.

## III. PLAINTIFFS' STANDING TO CHALLENGE THE CONSTITUTIONALITY OF THE NONDISCLOSURE AGREEMENTS

As originally filed, the complaints in *NFFE* and *AFGE* sought a declaration that SF 189, SF 4193, and related forms are unconstitutional as overbroad and impermissibly restrictive of First Amendment rights.[14] In their motion to dismiss, the defendants contest the standing of the individual and labor union plaintiffs to chal-

---

14. Plaintiffs in *AFSA* challenge only the Executive's interpretation of section 630 and implementation of nondisclosure agreements under this provision of the Continuing Resolution.

lenge the constitutionality of the nondisclosure forms. Defendants argue, as they did regarding the section 630 claims, that neither the individuals nor the labor unions have alleged an injury-in-fact upon which standing may be founded. In defendants' view, only threatened or actual discharge is sufficient to satisfy the constitutional requirement of injury-in-fact.

 This stringent view of standing is without foundation. As noted in sections II.A and II.B.2 of this opinion, injury need not be consummated to establish standing. *See Babbitt*, 442 U.S. at 298, 99 S.Ct. at 2309 ("certainly impending" injury is enough). Moreover, the chilling effect of governmental action on exercise of First Amendment rights may be sufficient injury-in-fact if the exertion of governmental power is regulatory, proscriptive, or compulsory in nature. *See Laird*, 408 U.S. at 11, 92 S.Ct. at 2324–25. The vitality of "chill" as a premise for standing turns on the existence of objective causes for the plaintiffs' reluctance to exercise First Amendment Rights. An entirely subjective chill is not injury-in-fact. The action must have already been taken or threatened. *Id.* at 13–14, 92 S.Ct. at 2325–26.

 The "chill" alleged by plaintiffs arises entirely from compelled execution of the nondisclosure agreements which expressly and impliedly threaten discharge or loss of security clearance. Execution of an agreement subjects the signatory to civil and employment penalties for unauthorized disclosure of classified or "classifiable" information. Despite the clarification of the term "classifiable," plaintiffs reasonably contend that the vagueness of the term precludes precise delineation of information that may not be disseminated. Thus, the

legitimate exercise of First Amendment rights is potentially impaired. This "chill" constitutes injury-in-fact.[15]

The labor union plaintiffs have standing to represent their members in this case because those members who have signed the forms have standing in their own right to seek redress. As already noted, protection of the members' interest is squarely within the avowed purposes of the unions. Additionally, there is no reason to require that individual members participate in the suit. *See Hunt*, 432 U.S. at 343, 92 S.Ct. at 2441.

 All of the individual plaintiffs have standing because they have signed or been directed to sign SF 189 or SF 4193. The government's attempt, successful or not, to compel execution of the forms has plausibly had a chilling effect on the exercise of First Amendment rights. Plaintiffs have sufficiently alleged that execution of the forms is compelled by threats of discharge or loss of security clearance. Moreover, plaintiffs Douglas and Brase, who have executed SF 189 and SF 4193, respectively, suffer the additional effects of the threat of enforcement of the forms.

## IV. THE AUTHORITY OF CONGRESS TO RESTRICT PRESIDENTIAL REGULATION OF ACCESS TO AND DISCLOSURE OF NATIONAL SECURITY INFORMATION

 Assuming that the Executive's actions since enactment of section 630 do not comply with the requirements of that legislation, the defendants argue that section 630 unconstitutionally impinges on the President's discretion to regulate access to and disclosure of national security information.[16] Traditionally, Executive Orders

---

**15.** The standing analysis is inextricably related to the merits of plaintiffs' constitutional claims. By merely alleging an injury-in-fact, plaintiffs do not necessarily succeed on the merits of their claim. The overbreadth doctrine of the First Amendment requires a careful examination of the government's interest in restricting speech. Thus, plaintiffs' injury may be sufficient to reserve a seat for them in the courtroom, but the Court may decline to remedy the injury.

**16.** Without the benefit of extended discussion, the Court notes that this assumption is well-founded. Section 630 expressly bars the use of fiscal year 1988 funds to "implement or enforce the agreements in Standard Forms 189 and 4193." Nevertheless, the DCI continued to require execution of the form until March 22, 1988 when SF 4355 was adopted. The addendum to SF 4193, which purports to cleanse the agreement of provisions offensive to section 630, plainly is not "true to the congressional

have been the mechanism for establishing systems for ensuring the secrecy of sensitive information. *See, e.g.*, Exec. Order No. 10290, 3 C.F.R. § 790 (1949–1953 Comp.); Exec. Order 12,356. The constitutional premise for the President's oversight of national security information is his role as Commander in Chief, U.S. Const., Art. II, § 2, and head of the Executive Branch. *See Department of Navy*, 108 S.Ct. at 824. This role for the President is sensible, in defendants' view, because national security information is generated primarily by the Executive Branch to assist the President in conducting foreign relations. *See United States v. Curtiss-Wright Corp.*, 299 U.S. 304, 319, 57 S.Ct. 216, 220, 81 L.Ed. 255 (1936). Never has the President's activity in this area been dependent upon express legislative authorization. *See Department of Navy*, 108 S.Ct. at 824 (citing *Cafeteria Workers v. McElroy*, 367 U.S. 886, 890, 81 S.Ct. 1743, 1746, 6 L.Ed.2d 1230 (1961)); *National Security and Civil Liberties*, 85 Harv.L.Rev. at 1198.

The defendants' position does not preclude congressional activity relating to national security information, and they admit that categorical division of responsibility between the Legislative and Executive Branches is not possible. *See United States v. American Telephone & Telegraph Co.*, 551 F.2d 384, 392–93 (D.C. Cir.1976). Tradition and prudence, they contend, in construing constitutional apportionment of authority demand that Congress be excluded from restricting the means by which the Executive protects national security information. Concurring in *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822

(1971), Justice Stewart discussed the critical importance of secrecy to the effective discharge of the President's almost plenary power over national defense and international relations. He noted:

> If the Constitution gives the Executive a large degree of unshared power in the conduct of foreign affairs and the maintenance of our national defense, then under the Constitution the Executive must have the largely unshared duty to determine and preserve the degree of internal security necessary to exercise that power successfully.... [I]t is clear to me that it is the constitutional duty of the Executive—as a matter of sovereign prerogative and not as a matter of law as the courts know law—through the promulgation and enforcement of executive regulations, to protect the confidentiality necessary to carry out its responsibilities in the fields of international relations and national defense.
>
> This is not to say that Congress and the courts have no role to play. Undoubtedly Congress has the power to enact specific and appropriate criminal laws to protect government property and preserve government secrets.

*Id.* at 729–30, 91 S.Ct. at 2149. Accepting this broad portrayal of Executive power, defendants conclude that section 630 unconstitutionally impairs the President's power to fulfill his plenary responsibilities to ensure a sound national defense and represent the interests of the United States in other nations.[17]

Plaintiffs' response is simply that defendants take an overly broad view of the complaints and the effect of section 630. "[T]his case concerns discrete limits that

---

mandate from which it derives authority," *Farmers Union Central Exchange, Inc. v. FERC*, 734 F.2d 1486, 1499–1500 (D.C.Cir.1984), and is based on an "erroneous view of the law" as Congress has written it. *Prill v. NLRB*, 755 F.2d 941, 947 (D.C.Cir.1985) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 95, 63 S.Ct. 454, 463, 87 L.Ed. 626 (1943)). Thus, if section 630 embodies constitutionally permissible congressional action, judicial review under the APA, 5 U.S.C. § 706, of the DCI's action would likely determine the action to be contrary to law.

**17.** Equally troubling to the defendants is Congress' alleged attempt by section 630 to impose

substantive limitations with a budgetary enactment. Section 630 is merely an appropriations measure by which no substantive rights or causes of action are created. By such a measure, Congress cannot accomplish that which by direct legislative action would be beyond its constitutional authority. *Cf. United States v. Lovett*, 328 U.S. 303, 316, 66 S.Ct. 1073, 1079, 90 L.Ed. 1252 (1946) (budgetary action designed to punish certain individuals is Bill of Attainder just as if Congress had passed law declaring individuals guilty of crime).

Congress has placed on the extent to which such nondisclosure agreements can limit congressional disclosures and can go beyond information that is classified pursuant to executive order or in the process of being so classified." Plaintiffs' Opposition to Defendants' Motion to Dismiss at 11.

If by "discrete" plaintiffs mean identifiable or enumerated, their characterization of this case and section 630 may be correct, but the fact that provisions of section 630 are clearly stated does not immunize it from constitutional challenge. Given the constitutional and traditional role of the Executive in assuring the nation's security and gathering and protecting the information essential to that security, section 630 demands some pronouncement of the permissible scope of congressional intrusion upon these functions. Ordinarily difficult, the task of drawing a line across which the political branches may not tread is more troublesome in this context because judicial consideration of this problem has been rare. *See United States v. American Telephone & Telegraph Co.*, 551 F.2d 384, 390 (D.C.Cir.1976), *on rehearing* 567 F.2d 121, 126–27 (D.C.Cir.1977).

Neither political branch is expressly charged by the Constitution with regulating accumulation of or access to national security information. *American Telephone & Telegraph Co.*, 567 F.2d at 128 (citing L. Henkin, Foreign Affairs and the Constitution 16–17 (1972)). "The authority to protect such information falls on the President as head of the Executive Branch and as Commander in Chief." *Department of Navy*, 108 S.Ct. at 824. Historically, the role of Congress in this arena has been to facilitate secrecy with appropriate criminal and civil sanctions. *See New York Times*, 403 U.S. at 730, 91 S.Ct. at 2149. Section 630 departs from history and threatens the balance struck by time and constitutional implication between the pervasive importance of strict protection of national security information and Congress' institutional need for that information.

■ The sensitive and complicated role cast for the President as this nation's emissary in foreign relations requires that congressional intrusion upon the President's oversight of national security information be more severely limited than might be required in matters of purely domestic concern. *See Curtiss–Wright*, 299 U.S. at 320, 57 S.Ct. at 221. Section 630 cannot be construed as consistent with this principle or with the President's recognized authority. The statute does much more than protect Congress' access to classified information—a goal readily achieved by subpoena or perhaps cooperation. *See American Telephone & Telegraph*, 567 F.2d at 130–32. With a tug on the purse strings, Section 630 establishes a precedent unrestrained by discernible standards and intrudes dramatically upon Presidential authority.

■ Particularly offensive to the need for judicially manageable standards are subsections (3) through (5) of section 630. The first of these prohibits obstruction by the Executive of the right of any federal employee to communicate with Congress under the rules of Congress for maintaining security. Subsection (4) bars interference with "the right of the Congress to obtain executive branch information" under similar rules for maintaining security. The last of these subsections bars any nondisclosure agreement that imposes an obligation or provides a remedy inconsistent with existing statutes. Read together, these provisions of section 630 permit the President to ensure the secrecy of national security information only by those means authorized by Congress.

Wherever may be drawn the line between the political branches in the area of regulating access to national security information, section 630 surely falls within territory where it is not welcome. The statute impermissibly restricts the President's power to fulfill obligations imposed upon him by his express constitutional powers and the role of the Executive in foreign relations. Section 630 is, therefore, unconstitutional.

## V. PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND DISPOSITION OF THE AFSA CASE

Originally filed by plaintiffs in *AFSA*, the motion for preliminary injunction seeks

equitable enforcement of the proscriptions of section 630. Because the Court finds that legislation to intrude beyond constitutional limitations into the realm of the Executive, relief of any kind based on section 630 is necessarily unavailable. The consequence is not merely that a preliminary injunction will not be entered.

The *AFSA* case is founded entirely on section 630 which, in light of the Court's ruling, provides no basis for relief. Without section 630 as a legal foundation for their claims, the plaintiffs in that case state no claim upon which relief can be granted. *See District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1081 (D.C.Cir.1984); *Sacks v. Reynolds Securities, Inc.*, 593 F.2d 1234, 1239 (D.C.Cir.1978). Moreover, because the Court was presented with and considered material extrinsic to the pleadings and the parties had adequate opportunity to submit such material, defendants' motion to dismiss will be treated as a motion under Rule 56 for summary judgment. *See Sacks*, 593 F.2d at 1239; Fed.R.Civ.P. 12(b). Accordingly, summary judgment will be entered for defendants in *American Foreign Service Association v. Garfinkel*, Civil Action No. 88–0440–OG (D.D.C. filed Feb. 19, 1988). For the same reason, Count III of the complaint in *National Federation of Federal Employees v. United States*, Civil Action No. 87–2284–OG (D.D.C. filed Aug. 17, 1987) and Count XIII of the complaint in *American Federation of Government Employees v. Garfinkel*, Civil Action No. 87–2412–OG (D.D.C. filed Sep. 1, 1987) are dismissed.

## VI. OTHER CLAIMS RAISED BY PLAINTIFFS IN NFFE AND AFGE

Apart from First Amendment overbreadth and vagueness claims, plaintiffs in *NFFE* and *AFGE* offer a variety of constitutional and statutory theories upon which SF 189, SF 4193, and similar nondisclosure forms might be declared unlawful. Defendants characterize some of the claims based on these theories as frivolous and move to dismiss them as without basis in the law.· Additionally, defendants' motion provides occasion for the Court to consider the legal sufficiency of all the remaining claims. *See Hudgins v. I.R.S.*, 620 F.Supp. 19, 20 (D.D.C.1985) (dismissing under Rule 12(b)(6) *sua sponte* ); *Martin–Trigona v. Acton Corp.*, 600 F.Supp. 1193, 1201 (D.D. C.1984) (same).

A. *Distinctions Between SF 189 and SF 189–A Do Not Deprive Federal Employees of Equal Protection Under the Law*

■ SF 189–A, a variant of the ISOO's SF 189, is a nondisclosure agreement presented for execution to government contractors who may require access to classified information. The variation of allegedly constitutional dimension is the omission from SF 189–A of the term "classifiable." Because the distinction is not inherently invidious, does not impinge on any fundamental right, and does not create a suspect classification, the Court's scrutiny of the variation must be minimal. *See Schweiker v. Wilson*, 450 U.S. 221, 230, 101 S.Ct. 1074, 1080, 67 L.Ed.2d 186 (1981); *San Antonio School District v. Rodriguez*, 411 U.S. 1, 29, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973). At this level of judicial review, the government's action need only be rationally related to a legitimate objective. *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970).

■ Typically, the courts are summoned to examine the rationality of a governmental classification when the legislature addresses social or economic problems. *See Schweiker*, 450 U.S. at 230, 101 S.Ct. at 1080; *Dandridge*, 397 U.S. at 485, 90 S.Ct. at 1161. Judicial deference to legislative judgments in these areas recognizes that the legislatures are "the appropriate representative body through which the public makes democratic choices among alternative solutions to social and economic problems." *Schweiker*, 450 U.S. at 230, 101 S.Ct. at 1080. Restraint is equally appropriate because the courts "lack both the expertise and the familiarity with local problems so necessary to the making of wise decisions with respect to the raising

and disposition of public revenues." *Rodriguez*, 411 U.S. at 41, 93 S.Ct. at 1301. The breadth of leeway afforded legislatures in these areas is so substantial that "if any state of facts reasonably can be conceived that would sustain [social or economic legislative action], the existence of that state of facts at the time that the law was enacted must be assumed." *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78–79, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911) (*quoted in Dandridge*, 397 U.S. at 485, 90 S.Ct. at 1161).

▇▇▇▇ Just as Congress' institutional competence to make economic and social policy justifies minimal scrutiny, the acknowledged expertise of the President in protecting national security information demands commensurate restraint by this Court. The use of "classifiable" in SF 189, but not SF 189–A, is legitimately explained by the primary access of federal employees to information generated by the Executive branch from a variety of intelligence sources. Contractors ordinarily will have access to such information only after it has been filtered through government employees with the expertise and authority to classify documents. The protection of such documents is a legitimate goal reasonably achieved by the expanded scope of SF 189, and the Court is without competence to say that the Executive's judgment is "patently arbitrary or irrational." *United States Railroad Retirement Board v. Fritz*, 449 U.S. 166, 177, 101 S.Ct. 453, 460, 66 L.Ed.2d 368 (1980). Accordingly, the cited distinction between SF 189 and SF 189–A states no claim under Equal Protection principles embodied in the Fifth Amendment, and Count III of the *AFGE* complaint is dismissed.

**B.** *There Is No Private Right of Action Under the Whistle–Blower Protection Statute*

▇▇▇▇ Section 101(a) of the Civil Service Reform Act ("CSRA"), Pub.L. No. 95–454, 92 Stat. 1114 (1978), bars personnel action against any federal employee in retaliation for disclosure of information evidencing "a violation of any law, rule, or regulation, or

... mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety." 5 U.S.C. § 2302(b)(8)(A) (1982). This protection against reprisal evaporates, however, if the disclosure is "specifically prohibited by law [or] if [the] information is ... specifically required by Executive order to be kept secret in the interest of national defense or the conduct of foreign affairs." *Id.*

To enforce the protection against retaliatory personnel action, the CSRA establishes an elaborate scheme which requires investigation by the Office of Special Counsel of the Merit Systems Protection Board of any allegedly prohibited personnel action. *Id.* § 1206(c)(1)(A). The CSRA is entirely silent regarding judicial enforcement of the prohibitions against reprisal. Considering these entirely consistent characteristics of the CSRA, the court in *Borrell v. United States International Communications Agency*, 682 F.2d 981, 987 (D.C.Cir.1982) determined that section 101(a) creates no private right of action to enforce in the district courts the prohibitions against retaliation for whistle-blowing. The Court of Appeals affirmed a district court ruling that subject matter jurisdiction is lacking over any action founded on section 101(a). *Id.* at 988.

The *Borrell* decision is fatal to claims in *NFFE* and *AFGE* that SF 189 and SF 4193 are unlawful because they create a mechanism for retaliation against whistle-blowers in contravention of the CSRA. This Court lacks jurisdiction over any such claim. Accordingly, Count I of the *NFFE* complaint and Count IV of the *AFGE* complaint are dismissed.

**C.** *The Code of Ethics for Government Service Affords No Legal Basis for Challenge of Nondisclosure Agreements*

▇▇▇▇ In 1980, Congress adopted a ten-point Code of Ethics to be posted in all federal buildings. Pub.L. No. 96–303, § 3, 94 Stat. 855 (uncodified). The ninth of these guidelines for conduct of federal employees states that "[a]ny person in Government service *should* ... [e]xpose corruption wherever discovered." (Empha-

sis added). By its terms, this Code of Ethics is entirely advisory and imposes no affirmative legal obligation on any government employee to investigate or disclose corruption in government.

Count VI in the *AFGE* complaint asserts that SF 189 and SF 4193 are unlawful because they are contrary to the Code. Such an argument is patently frivolous and unnecessarily duplicative of other legal theories in the complaint. Catch-all pleading of this kind only serves to distract the Court's attention from worthwhile claims. Accordingly, Count VI is dismissed.

### D. *Count VIII Omits an Essential Element of a Claim Under Section 706(2)(C) of the APA*

█ When asked to examine agency action, the reviewing court may hold unlawful such action if it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Demanding such a determination by this Court regarding SF 4193, plaintiffs argue that the DCI promulgated the form on the basis of paragraph 1(b) of NSDD 84. That paragraph was allegedly withdrawn by the President in 1984.

Assuming that plaintiffs correctly describe the status of paragraph 1(b) of NSDD 84, they entirely omit an essential element of review under section 706(2)(C) of the APA. NSDD 84 is a presidential document establishing guidelines for protection of national security information. Certainly, plaintiffs must admit that NSDD 84 is not a statute; yet this Court is empowered by section 706(2)(C) only to verify that SF 4193 is within the scope of the DCI's statutory authority. Because plaintiffs cite no statute by which the SF 4193 should be measured, they fail to state a claim, and Count VIII of the complaint in *AFGE* is dismissed.

### E. *The Copyright Clause Does Not Preclude the Executive from Requiring Federal Employees to Assign to the Government the Proceeds of Any Unlawful Disclosure of Government Information*

█ No less frivolous is the claim made by plaintiffs in *AFGE* that the Copyright Clause, U.S. Const., art. I, § 8, cl. 8, preempts any attempt by the President to require his employees to assign to the government the proceeds of an unlawful disclosure of government information. While making sense of this claim is a formidable challenge, plaintiffs appear to argue that SF 189 and SF 4193 create a property right that may only be created by Congress. These forms, however, cannot be construed by even the most liberal interpretation to create an exclusive right for anyone in any writing. They do not give the government an exclusive right to any information; at most, they impose a sanction by agreement for the unauthorized disclosure of government information.

The legality of such an assignment of proceeds is unequivocally established by *Snepp v. United States*, 444 U.S. 507, 515, 100 S.Ct. 763, 768, 62 L.Ed.2d 704 (1980) (per curiam). As a condition of his employment with the CIA, Snepp had signed an agreement assigning to the government any proceeds of disclosure of any information relating to the agency which disclosure was not submitted for prepublication review. Addressing Snepp's claim that the agreement was an unconstitutional prior restraint on protected speech, the Supreme Court declared that "the agreement [was] an 'entirely appropriate' exercise of the CIA Director's statutory mandate to 'protec[t] intelligence sources and methods from unauthorized disclosure.'" *Id.* at 509 n. 3, 100 S.Ct. at 766 n. 3 (quoting *United States v. Snepp*, 595 F.2d 926, 932 (4th Cir.1979) and 50 U.S.C. § 403(d)(3)). Plaintiffs in *AFGE* have entirely ignored the force of this authority which directly contradicts Count IX of their complaint. Accordingly, that Count is dismissed.

### F. *Plaintiffs in AFGE State No Claim Under the Freedom of Information Act*

█ The Freedom of Information Act ("FOIA"), Pub.L. No. 89–554, 80 Stat. 383 (1966) (codified at 5 U.S.C. § 552), requires that government agencies "make available

to the public" a variety of information generated by them. The purpose of FOIA is to permit access to governmental information the secrecy of which is unnecessary. *See EPA v. Mink*, 410 U.S. 73, 80, 93 S.Ct. 827, 832, 35 L.Ed.2d 119 (1973). Exceptions to the broad mandate for disclosure permit the agencies to withhold as confidential certain narrowly defined categories of information, including "matters that are ... specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and ... are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1).

Plaintiffs in *AFGE* reason that the Executive may not require its employees to withhold information in contravention of FOIA. While this may be true, plaintiffs are in no position to make such an argument before this Court. Neither the union nor the individual plaintiffs assert that they have sought information from the Executive under FOIA. Instead, they are complaining that SF 189 and SF 4193 preclude disclosure by them. Such a claim is not within the ambit of FOIA which authorizes this Court only to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld." 5 U.S.C. § 552(a)(4)(B). Accordingly, plaintiffs fail to state a claim under FOIA, and Count X of the complaint in *AFGE* is dismissed.

### G. *Counts XI and XII of the AFGE Complaint Are Unintelligible*

After several careful readings of Counts XI and XII of the *AFGE* complaint, the Court is unable to discern a singular legal theory upon which the plaintiffs might demand relief. Count XI appears to allege some contractual basis for declaring SF 189 and SF 4193 unlawful. The mere appearance of a claim, however, is insufficient to permit plaintiffs to move forward; they could prove no facts that would permit recovery on the unintelligible legal theory in Count XI.

Count XII suffers from similar faults and more. Rather than stating a discrete legal basis for declaring the nondisclosure forms unenforceable, plaintiffs restate, in summary, theories exposited elsewhere in their complaint. Perhaps, they realize that such a summary is necessary to conclude an eighty-seven paragraph complaint. Regardless, the Court is unable to discern a distinct basis for relief in Count XII. *See* Fed.R.Civ.P. 8(a). Therefore, it is dismissed.

### VII. CONCLUSION

The accompanying order sets forth in detail the effect of this opinion on the complaints in these consolidated cases. In summary, various plaintiffs have standing to challenge the Executive's interpretation and execution of section 630 of the Continuing Resolution and the constitutionality of various provisions of SF 189, SF 4193, and related forms. Nevertheless, the Court finds section 630 unconstitutional and, therefore, dismisses the *AFSA* case. For the same reason, counts in the *NFFE* and *AFGE* cases are dismissed. In addition, numerous counts in the *AFGE* complaint are dismissed for failure to state a claim. There remains essentially the plaintiffs' challenge of the nondisclosure agreements on First and Fifth Amendment grounds.